Mr. Justice Olifeokd
delivered the opinion of the court:
Private claims against the Government of the United States, founded upon any law of Congress, or upon any regulation of' an Executive Department, or upon any contract, express or implied, with the Government, are within the jurisdiction of the' Court of Claims, as appears by the second section of the act passed to amend the act establishing that court. (12 Stat. L., p. 765.)
Comprehensive as that provision is, still doubts were entertained whether the. claim of the appellant was not excluded from the jurisdiction .of the court by the ninth section of the amendatory act, but all doubt upon the subject was removed by the joint resolution subsequently passed, by which Congress,, in express terms, referred the claim to that court for adjudication, to he examined and decided in the same manner as other claims against the United States under existing laws. (14 Stat. L., p. 611.)
I. Pursuant to that authority the appellant, as the representative of the deceased claimant, presented his petition to the Court of Claims, setting forth very fully the nature of his alleged cause of action and the ground upon which he claims to recover-in this case. His ancestor, the decedent, was a native-born citizen of the United States. Early in the present century he-went to Spain, and while resident there became extensively engaged in commerce with that country. He was there during the invasion of the French under Napoleon, and continued to-reside there until the treaty of amity, settlement, and limits between Spain and the United States was ratified by both parties.. Throughout that period he was constantly engaged in mercantile pursuits, and he also entered into numerous contracts with • the government of that country, prior to the date of the treaty* by means of which Spain became very largely his debtor.
*170 Part of bis claims consisted of fourteen unliquidated accounts for goods sold and delivered, and it also appears that be was illegally arrested during that period, and that be was imprisoned by tbe order of tbe government, for wbicb wrongs and personal injuries be also beld large unliquidated claims. Unable to regain bis freedom from tbe unjust imprisonment be sought tbe aid of tbe United States, and it appears that it was not until our Government interfered that be was released from bis confinement. JBotb before and after tbe date of tbe treaty be invoked tbe aid of tbe Government of tbe United States in collecting bis claims, as well those arising from contracts as those arising from unjust imprisonment and personal injuries.
Prior to tbe date of tbe treaty tbe claimant filed in tbe office of tbe Secretary of State a notice of bis claims against that government, amounting, as be alleged, to $400,000, and tbe finding of tbe court below shows that tbe notice so filed was one of tbe notices referred to and included in tbe treaty between tbe two countries. Reclamations were also made by many other citizens of tbe United States upon Spain for wrongs and injuries ■ suffered by them through tbe acts or official orders of that government, notices of wbicb were either filed in tbe State Department or bad been presented to tbe minister of tbe United States resident in that country. Questions of great magnitude, also, touching treaty obligations previously contracted, tbe settle,ment of disputed territorial limits, and tbe cession of new territorial possessions, were under diplomatic discussion between tbe plenipotentiaries of tbe two governments.
Pending these reclamations, and at a moment when tbe state of tbe negotiations presented strong hopes that they might terminate successfully, the claimant informed tbe Secretary of «State that it bad been intimated to him that if be would advance a further sum of money to that government be might procure a grant of lands in Florida sufficient to cover tbe whole amount of bis claims. Evidently bis purpose was to ascertain whether such a grant, if made, would be sanctioned and respected by tbe United States in case tbe then’pending negotiations should be successful and Florida should be ceded to our jurisdiction.
II. Equal and exact justice to all tbe claimants was what our Government was endeavoring to secure by tbe negotiations, • and, of course, the suggestion received no encouragement what *171 ever, as it contemplated a separate provision for one to the exclusion of tbe rest. On the contrary, the reply of the Secretary was to the effect that if the treaty of cession was concluded it would contain a provision that all grants made after a given date, to be fixed by the contracting parties, should be null and of no effect. Influenced by that reply he abandoned any further attempt to collect his claims by procuring a grant of land, and submitted the same to the State Department “ for that protection which his Government may think proper to grant.”
On the 22d of February, 1819, the treaty of amity, settlement, and limits was signed by the respective plenipotentiaries of the two countries, and the Senate of the United States ratified the same on the 24th of the same month. (8 Stat. L., p. 264; 3 Exec. Jour., p. 177.)
All the territories which belonged to Spain, situated to theeastward of. the Mississippi, known by the name of East and West Florida, were agreed to be ceded to the United States in full property and sovereignty, the United States contracting that all the grants of land made therein by Spain, or by her lawful authorities, before the 24th of January, 1818, the date when the first proposal for the cession was made, shall be ratified and confirmed to the persons in the possession of the lands to the same extent that the same grants would be valid if the territories had remained under the dominion of the former sovereign, but the contracting parties also stipulated, in the same article ■of the treaty, that all grants made subsequent to that date “ are hereby declared and agreed to be null and void.”
Animated with a desire of conciliation, and with the object of putting an end to all differences existing between them, the ■contracting parties reciprocally renounced all claims for damages which they themselves or their respective citizens and subjects “have suffered until the time of signing this treaty.” Such claims for damages so renounced by the respective parties, on the one side or the other, were classified in the ninth article of the treaty under different heads, but it will not be necessary to refer to any of the classifications with much particularity, except to the fifth class renounced by the United States, which releases all claims of our citizens “ until the signature of this treaty,” statements of which, soliciting the interposition of the ■Government of- the United States, have been presented to the Department of State or to the minister of the United States *172 subsequent to the antecedent convention between the two countries.
Claims to which the described renunciation extends were declared by the eleventh article of the treaty to be entirely canceled, and the United States contracted, not only to exonerate Spain from all demands in future on account of such claims, but also “ to make satisfaction to their citizens for the same to an amount not exceeding five millions of dollars.” Subsequent demand by the United States for any such claim was entirely prohibited, and the United States also contracted to appoint three commissioners to ascertain and adjudicate the full amount of all such claims, and the stipulation was that the commissioners should receive, examine, and decide upon the amount and validity of all the claims of citizens of the United States so renounced and canceled. They were also authorized to hear and examine on oath every question relative to the said claims, and to receive all suitable authentic testimony concerning the same, and the sovereign of Spain contracted to furnish all such documents and elucidations as were in the possession of that government for the adjustment of the claims according to the principles of justice, the law of nations, and the stipulations of the prior treaty between the contracting parties.
III. Yiewedin the light of these several suggestions nothing can be more certain than the conclusion that the claims in question, at the time the treaty was signed, were included in its provisions, and u that the authority and the trust of examining, ascertaining, and deciding upon their amount and validity, were solely and exclusively committed to the commissioners” to be appointed under the treaty. Beyond question they were at that date unliquidated claims of a citizen of the United States, statements of which, soliciting the interposition of our Government, had not only been presented to the Department of State, but also to the minister of the United States, showing to a demonstration that the claims of the ancestor of the appellant were within the very words of the treaty. ,
Prompt action by the United States in ratifying the treaty did not, however, have the effect to secure corresponding pr omqititude on the part of the other contracting party. Delay ensued, which, for a time, was wholly unexplained, but it soon came to be understood that it arose from the fact that pending the negotiations three grants of large tracts of land, situated in the ceded *173 territories, bad been made, wbiob our Government regarded as null and void under tbe closing provision of tbe eigbtb article of tbe treaty. Determined not to protect those grants, tbe Secretary of State instructed our minister to explain and declare upon tbe exchange of ratifications that tbe exchange was made “ with a full and clear understanding between tbe plenipotentiaries of both tbe high contracting parties that these grants were among tbe grants thus declared null and void.”
On tbe receipt of that dispatch Spain refused to ratify tbe treaty, and, through her minister, sent here for that purpose, objected to that requirement as inconsistent with tbe treaty, and be insisted that such a declaration, if made, would “ tend directly to annul one of its most clear, precise, and conclusive articles.” Pending this discussion tbe period fixed by tbe treaty for tbe exchange of tbe ratifications expired, but tbe United States notified tbe Spanish government tbe day previous that if tbe six months expired without such ratification they should bold themselves free to press and enforce their claims and pretensions in any and every mode, consistent with honor, that their interests may require.
Confessedly some of tbe expressions of that dispatch indicated that tbe United States might, under some circumstances, be induced to refuse to carry the treaty into effect, but they never made any such decision, and never did any act or uttered a sentiment which authorized tbe claimants interested in its provisions to assume that they bad come to any such conclusion. Nothing of tbe kind was ever intimated by tbe minister sent here from Spain, and tbe correspondence which ensued shows conclusively that neither party contemplated any such result. He came for explanations, but be was told before any reply was given to that part of bis communication that tbe President wished to be informed whether be was tbe bearer of tbe ratifications of tbe treaty previously signed and committed to tbe charge of our minister for that purpose. Obliged to answer that inquiry in tbe negative, be found it necessary to give explanations in behalf of bis own government before requiring any from the United States. Beference is made to that correspondence to show that tbe treaty, as signed, was never abandoned by either party, and nothing was ever given or promised by tbe United States, except what is therein stipulated to secure its ratification.
*174 New articles to tbe treaty were not required by the new minister, and he was emphatically told by the Secretary of State that the United States could not, consistently with what was due to themselves, stipulate any new engagements as the price of obtaining the ratification of the old; that the declaration which our minister was instructed to deliver at the exchange of the ratifications of the treaty with regard to the eighth article was not intended to annul or, in the slightest degree, to alter or impair the stipulations of that article; that the only object in view was to guard 'his Government and all persons interested in any of the annulled grants against the possible expectation or pretense that those grants would be made valid by the treaty.
Although the Secretary of State informed the minister sent here for explanations that the question of ratification on the part of the United States must be again submitted to the Senate, because the six months had expired, still he insisted that it should be ratified by the other contracting party without delay and without any alterations, showing conclusively that the consummation of the arrangement was both contemplated and desired. (4 Am. St. Papers, 683.)
IV. -Power to annul the grants in question or to declare them null and void, as required by our Government, it was insisted by the Spanish negotiators, did not reside in the King alone, that the consent of the Cortes must first be had before the required declaration could be made; and it does not appear that any attempt was made on the part of our Government to controvert that proposition. Further delay necessarily ensued, but the consent of the Cortes was given on the 5th of October, 1820, and on the 24th of the same month Spain ratified the treaty without alteration or amendment.
Occurring, as these matters did, in the recess of the Senate, further action was necessarily deferred until the meeting of Congress. By special message the President, on the 13th of February, 1821, informed the Senate that the minister of Spain had given notice that he was ready to exchange the ratifications of the treaty, and it appears that the Senate, on the 19th of the same month, again consented to and advised the President to ratify it, without making any amendment to the same or suggesting any qualification whatever to any of its provisions. (3-Exec. Jour., 244.)
*175 Application had been made by the deceased claimant, to the government of Spain, before his claims were transmitted to the State Department, requesting that the King would appoint a commission to liquidate his claims, but, on the 17th of January, 1819, when the prospect brightened that a treaty would be com eluded, he submitted his claims to the Department of State “for that protection which his Government may think proper to grant.”
No such commission was appointed until after the minister who signed the treaty had been recalled, and the United States-had been informed by his successor that his government regarded the declaration which our minister was instructed to-exact, when the ratifications of the treaty should be exchanged, as tending “ directly to annul one of its most clear, precise,, and conclusive articles.” Eeluctant to make the required declaration, Spain recalled her minister and “ suspended the ratification of the treaty;” and on the 7th of May, 1819, she appointed, the commission previously requested by the claimant, and it appears that the commission in eleven days afterward informed the claimant that they were prepared to receive his proofs and hear his explanations. (Meade v. United States, 2 N. & H., 256.)
They, the commissioners, proceeded promptly to the discharge of their duties, and on the 31st of August following they notified the claimant to produce the documentary evidences to support his claims, and it appears that he,’in the course of a few weeks, transmitted the originals to the commission. Perfect success-attended his efforts, as the commission, with the express and formal approval of the King, on the 19th of May, 1820, made an award in his favor for the sum of $373,879.88 in our currency,, which included his fourteen unliquidated contract claims, with-interest to the time of such liquidation; and also a sum in gross-on account of his claims for personal injuries.
Justice had been denied him for years, but it was now promptly accorded in the award, and the finding of the-court below shows that the King at the same time approved a-certificate of the award, in accordance with the laws and customs of the country, and delivered the same to the claimant as conclusive evidence of the verity of the award. By the fourth finding of the court below it also appears thatthe United States was notified of that result, both by the government of Spain and by the claimant, and thatthe Secretary of State expressed his approval *176 of it to both parties. Five clays before the treaty was, the second time, submitted to the Senate for their advice, the claimant addressed a memorial to the President, making known for the first time what his pretensions were in the new aspect of his claim.
Y. Briefly stated, they were to the effect that the Senate, if the treaty should be submitted for ratification, should either annex a new article recognizing his claim as expressed in the award made after the treaty was signed, or, if that could not be conceded, that the fifth renunciation should be. explicitly excepted from the ratification and expunged from the treaty. Unless he could have a distinct recognition of his claim, he -asked, as an act of justice, that the alternative request might be granted that he might “ be left free to prosecute the claim where it is unquestionably due, unembarrassed with the imposing renunciation of my country.” Stronger language to ■express his convictions that his claim, as it existed when the treaty was signed, was included in the fifth renunciation of the same, could not well be chosen than he employed in that memorial, where he says that it is his u decided election to abide the issue of an appeal to the moral sense and good faith of that nation rather than the chances of that contingent and long-deferred indemnity provided for the other claims into whose company mine has been introduced by the treaty.”
Addressed, as the memorial was, to the President, he referred it to the Secretary of State for his opinion, and nothing can be more conclusive as to the views of the Executive than the report of the head of the State Department. By the statement of the memorial itself, said Mr. Adams, it was questionable to the Cortes and to the minister of finance whether or not the claim was included in the renunciation of the ninth article. If it was, said the Secretary, the claimant will be entitled to the immunities stipulated by the treaty and in the form provided by the same instrument; if it was not, his resort is, as it originally was, exclusively to the Spanish government, and the Cortes, in recognizing his claim, have given directions for his payment. Both the memorial and the report of the Secretary of State were communicated to the Senate the next day after the treaty was transmitted for the consideration of that body.
Authority to appoint commissioners was conferred upon the President, as stipulated in the eleventh article of the treaty, by *177 the fourth section of the act of the third of March, 1821, and it is well known that they were duly appointed and commissioned as therein required. (3 Stat. L., p. 639.)
They were duly organized, as required, and exercised the functions of their office for the period of three years. During that time the claimant, as the finding of the subordinate court shows, presented his claim to the commissioners as expressed in the award made by the Spanish commission, and it appears that the commissioners of the United States refused to allow the claim in that form. He was fully heard, but they ruled and decided that the only claims which they had authority to investigate and allow were claims existing prior to the date of the treaty, and that inasmuch as the award presented was subsequent to the date of the treaty, they had no authority to investigate or allow it, and it appears that they accordingly rejected and dismissed the petition upon the ground that the evidence produced was not sufficient to establish the claim.
Plain as the decree of the commissioners is, it is not possible to misunderstand their views. They held that all unliquidated claims of our citizens upon that government, statements of which, soliciting the interposition of our Government, had been presented to the Department of State, or to the minister of the United States in Spain, since the former convention, and prior to the signature of the treaty, were within their jurisdiction, but that liquidated claims .or claims of subsequent date were not within their jurisdiction. Such also were the views of the Secretary of State in his very able dispatch of the twenty-ninth of April, 1823, addressed to the charge d’affaires from Spain. (Sen. Doc., 2d sess.lSth Cong., 248.)
He shows to a demonstration that the time of the signature, and not that of the ratification of either of the parties, nor that of the exchange of ratifications, is expressly agreed upon as the time, until which the claims and the statements of them to the Department of State, or to .the minister of the United States in Spain, had been received, which claims were, on the part of the United States, renounced by the fifth renunciation.
His reasoning is that it could not have been the intention of the parties that they should renounce claims, or admit statements of them, not known to the party assuming the obligation at the time of contracting it, and the court here entirely concurs in that construction of the article. Whatever claims, *178 therefore, might arise, or whatever statements of them might be made after the signature of the treaty, were not within that provision, because they could not, with propriety, be provided for in any such stipulation.
Beyond all doubt it was unliquidated claims for which provision was made, and neither party contracted that the other should determine their amount or validity, but the stipulation on the part of the United States was, that three commissioners should be appointed by the President, by and with the advice and consent of the Senate, and that the commissioners should determine the amount and validity of all such claims of our citizens.
Examined in the light of these suggestions we concur in the views of Mr. Adams, as expressed in that dispatch, that “ if anything in human intention can be made clear by human language, it is, that the claims provided for by the above stipulation were in the condition as they had been exhibited at the time of the treaty.” (1 Sen. Doc., 2 sess. 18 Cong., 250.)
YI. Transactions between the claimant and the government of Spain, subsequent to the signature of the treaty, could not be evidence to the commissioners of the condition of the claim at the time of that signature, and for that reason the court is of the opinion that the decision of the commissioners rejecting the claim, as expressed in that award, was correct. They did not reject the unliquidated claims of the appellant, as filed in the State Department, nor as presented to oar minister in Madrid before the treaty was signed. (1 Rep. Coin., 1 sess. 20 Cong., No. 58.)
Unambiguous as the decision of the commissioners is, there is no reason to suppose that the claimant was misled even for a moment. He knew that he had a right to present his claims to the commissioners as they existed at the time the treaty was signed, but he elected to stand upon the claim as it was expressed in the award, and he must abide the result, as in the opinion of this court the decision of the commissioners, that the award was not within the stipulations of the treaty, is correct.
Suppose all the preceding suggestions are correct, still the claimant insists that the judgment must be reversed on account of what appears in the fifth finding of the court. Unexplained the court below there find as follows: (1) That the Cortes refused to annul the three grants in question until the United *179 States should agree to pay and discharge in full the indebtedness of Spain to the deceased claimant, as recognized in the award of the Spanish commission. (2) That the United States, by their minister at the court of Madrid, gave to Spain “ a clear and distinct assurance that the debt due to the claimant would certainly be paid to him by the United States if the treaty was ratified, and the said grants were totally annulled.” (3) That the Spanish government, upon the faith of those assurances, annulled the grants and ratified the treaty. (4) That the claimant duly notified the Government of the United States of these facts, and of the assurances so given by our minister, and that the notice was duly received by the President, and was by him communicated to the Senate, at the same time that the advice of that body was asked, the second time, as to the ratification of the treaty. (5) That the United States, with full notice and knowledge of all the facts and circumstances set fort in that finding, did accept and assent to the treaty'as ratified by Spain, and became seized and possessed of the ceded territories.
Without stopping to show that the findings are contradicted by the testimony of our minister, or that they are improbable in themselves, or that they are unsupported by any satisfactory evidence, *we proceed at once to remark that the claimant is entitled to the full benefit of the rule that the facts found in the court below are to be regarded as in the nature of a special verdict. Grant all that, still the findings are subject to many criticisms.
By what means did the court become judicially informed that the Cortes refused to annul the grants in question until the United States should agree to pay and discharge in full the award held by the claimant ? Oral proof to that effect could hardly be obtained which would be of a satisfactory character, and if proof of that kind was not introduced, then the inquiry arises, upon what evidence does the finding rest 1
Legislative bodies usually act by decree, resolution, order, or vote, but nothing of the kind is referred to as existing in this case. Depositions of two witnesses were introduced to show that our minister gave the assurances specified in the finding, but he states in his deposition that he does not remember that he ever gave any such assurances, and there is no reason to conclude that he ever intended to enter into any con *180 tract upon that subject. Who knows that the government of Spain, in deciding to annul those grants, acted upon the faith of the assurances given by our minister that the claims of the ancestor of the appellant would be paid in full, as expressed in the award made long after the treaty was signed; and if no one is able to give testimony to that effect, by what means was the conclusion formed ? Tested by these or any similar considerations it is easy to see that the several conclusions embraced in the fifth finding are conclusions of law rather than conclusions of fact, as they depend mainly, if not entirely, upon the construction of public acts, diplomatic dispatches, and treaty stipulations.
Eegarded in that light the finding of the court below may be re-examined here on appeal, but it is not necessary to rest the decision in this case upon that ground, as by the very terms of the finding it appears that the assurances which it is supposed misled the Cortes were given by our minister, and there is no evidence whatever that in giving the assurances he acted in pursuance of any instructions from the President or by virtue of any authority from the United States. Negotiations are usually conducted under instructions from the President, and the provision of the Constitution is that u he (the President) shall have power, by and with the advice and consent of the Senate, to make treaties, provided two-thirds of the Senators present concur.”
Such an assurance as that supposed could not be given by any minister of the United States, except upon the condition that it should become a treaty stipulation, and as such be subject to the approval of the President and be ratified by the Senate, as required by the Constitution.
Even if the finding had any foundation in fact, it is clear that the act of our minister in giving the assurances was wholly without authority, and that the act was null and void, which must have been known to the Spanish government and to the claimant.
YII. Examination will next be made of certain other complaints made by the appellant, as exhibited in the eighth finding of the court below. The substance of that finding is as follows: (1) That the claimant, on the seventh of April, 1823, and before the commissioners under the treaty rejected his claim as founded upon the award, requested the United States to pro *181 cure from the Spanish government his original vouchers and evidences of indebtedness; that the United States made the demand as requested, but that the Spanish government positively refused to comply with the request, upon the ground that the award was a judicial decree and was final and conclusive. (2) That the Spanish government did subsequently assure the United States that the vouchers and documents would be given up, but that the same never were produced and have ever since been, and still are, withheld. (3) That by reason of such refusal and neglect on the part of Spain the commissioners never considered or allowed his claim; that they allowed the claims of other persons, existing x>rior to the treaty, to an ■ amount greater in the aggregate than the five million dollars provided- by the treaty, and that the commission, after making those awards, expired.
Eegarded in the most favorable light the facts stated in the finding do not show any ground of action against the United States: (1) Because it appears that the claimant never presented to the commissioners his unliquidated claims as they were filed in the State Department, or as they existed at the time the treaty was signed. (2) Because the finding does not show that he ever intended to x>rescnt his claims in that form to the commissioners, nor that he was prevented from so doing by the neglect and refusal of that government to produce his original vouchers and documents. (3) That even if the finding did show that he intended to jiresent his claims in that form, and that he was injured by the alleged neglect and refusal, still the admission would not benefit the appellant, as the finding, with that admission superadded, would not show any cause of action against the United States within the acts of Congress conferring jurisdiction upon the Court of Claims, as it would not show a claim founded upon any law of Congress or upon any regulation of an Executive Department, nor any claim founded upon any contract, express or implied, with the Government of the United States.
VIII. Some consideration must also be given to certain general propositions submitted by the appellant as tending to bring his case within the scope of an implied contract.
1. He contends that the United States had no power to release Spain from her obligations due to the ancestor of the *182 appellant, without liis assent, except upon the condition of making him just compensation for his claims.
Special examination of that topic or of its conditions and qualifications is not necessary, as thecase before the court comes within the rule, as conceded by the appellant, as his ancestor did submit his claims to the Department of State for that protection which his Government might- think proper to grant; and the finding of the court below is that the claimant, both before and after the date of the treaty, did invoke the aid of the United States in collecting his claims, both those arising on contracts and those arising from personal injuries. (2 Rep. Com., 1 sess. 22 Cong., No. 316. 3 Sen. Doc., 1 sess. 19 Cong., p. 66. De Bode v. The Queen, 3 Ho. Ld. Cas., 449.)
2. Attempt is also made to maintain the proposition that the power which the claimant gave to the United States to make reclamations in his behalf became revokabie by him after the six months fixed by the treaty for che exchange of the ratifications had expired but the proposition is wholly inadmissible, as the effect would be that whenever any such misunderstanding should arise between the contracting parties the negotiations might be controlled by a single claimant having some pecuniary interest in the treaty.
3. The next suggestion is that the act of the claimant in submitting his claims to the Spanish commission operated as a full and complete revocation of the power he previously granted to the United States to adjust his claims, but the proposition is even less defensible than the preceding one, as it would enable one of the contracting parties, by making terms with a citizen of the other party, to avoid the obligation of fulfilling a treaty stipulation.
4. Remark upon the sixth finding of the court does not seem to Re necessary, as what has been said in response to the fifth finding furnishes a full answer to every deduction made from it by the claimant. This award was made long after the treaty was signed, and the claim in that form never was included in the fifth renunciation. In his memorial he requested that a new article might be added to the treaty, making provision for the payment of his claim as expressed in thésaward, or that the fifth renunciation might be expunged, but the request was not granted, nor could it have been in the alternative form without defeating, iu all probability, the whole arrangement.
*183 Entitled as tbe claimant clearly was to prove bis unliquidated claims before tbe commissioners, it is much to be regretted that be did not seasonably come to tbe conclusion to adopt that course and avail himself of tbe plain right secured to him by the treaty. His error in that behalf increased tbe equation to other claimants, and now bis only remedy is by an appeal to tbe equity of Congress.
Under the circumstances one or two observations upon tbe conclusions of law certified by tbe court below will be sufficient. We do not concur in the first nor tbe second finding, except that part of it where tbe court say that tbe decision of the commissioners appointed by tbe United States dismissing tbe claim was final and conclusive, and bars a recovery .upon tbe merits in that court. We concur also in tbe third conclusion of law, and direct that the judgment be affirmed.